UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

------------------------------------------------------------------ X

MARVIN WINKFIELD,                          :      12-CV-3237 (ARR)
                                           :
                    Petitioner,            :      OPINION AND ORDER
                                           :
     -against-                             :
                                           :
GEORGE DUNCAN, Superintendent, Great Meadow :
Correctional Facility, and ERIC T. SCHNEIDERMAN, :
Attorney General of the State of New York, :
                                           :
                    Respondents.           :
                                           :
------------------------------------------------------------------ X

ROSS, United States District Judge:

     On June 12, 2012, Marvin Winkfield ("petitioner" or "Winkfield") filed a petition for a

writ of habeas corpus challenging his criminal convictions pursuant to 28 U.S.C. § 2254.[1]

Through counsel, petitioner claimed that: (1) he was denied the effective assistance of counsel

because his trial attorney, Michael Sheinberg ("Sheinberg"), failed to object to a burglary charge

that improperly diminished the government's burden of proof; and (2) the government failed to

prove the voluntariness of his confession, the admission of which at trial violated his right to due

process. Mem. of Law ("Pet'r's Mem.") 2. For the reasons stated below, I deny Winkfield's

petition.

## I. BACKGROUND[2]

### A.    The Attack

     Miguelina Cruceta ("Cruceta") owned a beauty salon in Brooklyn. Trial Transcript ("Tr.")

158. Cruceta personally cut her customers' hair, id. at 84, but also employed JG, the victim in

---

[1] The petition is dated June 12, 2012, on the signature block but was not filed until June 28, 2012. Dkt. #1, at 1, 14.

[2] Unless otherwise noted, the following facts are based on the evidence adduced at trial.

1

this case, to wash towels, clean, and help shampoo hair, id. at 80, 159.

On June 7, 2006, JG was alone in the salon. Id. at 82-83. Although normal business hours for the salon were from 10 a.m. to 7 p.m, Cruceta testified that the salon was closed for business that particular day because she had gone to New Jersey to buy products for the shop. Id. at 159. As Cruceta explained, the salon was not open "for customers, only to wash the towels and clean the shop." Id. JG, however, testified that "the salon was open because [Cruceta] had called [that morning] . . . and asked [JG] to make a note of all the appointments because it was June, it's graduation day for children." Id. at 84. JG explained that while she would not have been able to do anybody's hair herself, she would have called Cruceta had the need arisen. Id.

While JG was alone in the salon, Winkfield knocked on the door. Id. at 84-85; DVD Transcription ("DVD Tr.") 5. JG observed that "[h]e was tall, muscular, he was black, he had a hat and he had braids." Tr. 93. She also recalled that "[h]e was dark, not that dark," may have had some facial hair, and was carrying an umbrella. Id. at 137. JG testified about the ensuing interaction as follows:

> A.     When he knocked on the door, I had my eyebrow tweezers in my hand, I was fixing my eyebrows . . . . I went to the door and I told him we were closed and he said no, it's open. You know, I told him we were open, but it's closed, and he said he wanted to make an appointment for his wife. Her name was Tina.
> Q.     Had you opened the door at that point?
> A.     I opened the door because he said he wanted to make an appointment for his wife.
> Q.     Did you have to unlock the door?
> A.     Yes, a dead bolt that it had.
> Q.     Did the defendant give you a name for his wife?
> . . . .
> A.     He said his wife, who was named Tina.

Id. at 85-86. As Winkfield later confessed, however, he did not have a wife. DVD Tr. 6, 8. Instead, he simply "made up" the name Tina. Id. at 8.

While JG was looking for the appointment book, petitioner indicated that he wanted to go

to the bathroom and asked for JG's permission. Tr. 86; DVD Tr. 6. As JG recounted, "I thought about not letting him go, but he seemed to really have to go. Then I realized, you know, maybe he did have to go, so I let him go." Tr. 88. After Winkfield came out from the bathroom, he returned to the front of the salon. Id. at 89. He then asked JG to see some hairstyle books, and JG acceded to the request. DVD Tr. 7-8. She also made an appointment for "Tina" for the next day. Id. at 8-9.

Thereafter, Winkfield told JG that he had left his umbrella in the bathroom and started walking in that direction. Tr. 89-90, DVD Tr. 9. In response, JG said, "Okay, oh, yes, wait here. I'll go get your umbrella." Id. As JG walked back toward the bathroom, she realized Winkfield was following behind her. Tr. 90. Thinking that he was going to retrieve the umbrella himself, she turned to go get her lunch from the refrigerator instead. Id.

At that point, Winkfield grabbed JG from behind, and she started to cry and struggle. Id. at 91. As JG recounted, "I was trying to get away from him, get loose, and I was screaming to see if someone going by might hear me." Id. at 92. During the struggle, Winkfield repeatedly screamed at JG to let go of the eyebrow tweezers in her hand. Id. However, she refused to do so, because she feared that he might try to disfigure her with the tweezers. Id.

Winkfield forced JG into the bathroom and shut the door. Id. at 92-93. As JG continued screaming, he "kept getting angrier." Id. at 93. Winkfield then opened a cabinet or drawer in the bathroom, took out a hammer, and hit JG on the head. Id.; DVD Tr. 16-17. "[A]ll of a sudden," according to JG, "he turned diabolic. He was screaming and using a lot of foul language." Id. at 94. After Winkfield hit her on the head with the hammer, JG let go of the tweezers and told him that "the money's in the cash register." Id.; DVD Tr. 12. Feeling "very dizzy," she fell to the floor. Tr. 95-96. Winkfield continued hitting JG on the head with the hammer, using the sharp

3

end. Id. at 96; DVD Tr. 17-18.

While JG was lying on the floor, Winkfield took off her pants, ripped off her underwear, and inserted his penis into her vagina. Tr. 96, 103; see also DVD Tr. 16, 20. JG testified that Winkfield then "had his garbage, his orgasm." Tr. at 103; DVD Tr. 20. Thereafter, he put on gloves and tried to wipe down both JG and the bathroom with towels. Tr. 103; DVD Tr. 21. Feeling that he did not have enough to time to get the money from the cash register, Winkfield simply tried to "clean up everything" and then fled, taking the towels, and JG's pants and underwear, with him. Tr. 103-05; DVD Tr. 21, 37. Subsequently, petitioner threw the linens into a dumpster and took a Greyhound bus to Florida. Id. at 22.

JG waited for two minutes after Winkfield left and then called Cruceta and the police. Tr. 104. The police responded to JG's call right away, administered first aid to her, and brought her to the Lutheran Medical Center. Id. at 105.

## B.    The Investigation

### 1.    Physical evidence from JG and the crime scene

At the Lutheran Medical Center, JG was treated by a doctor, who diagnosed her with "blunt head trauma, a head concussion, multiple scalp lacerations" and also concluded that she had been raped. Tr. 355. In addition, a resident in gynecology administered a rape kit to collect evidence of the sexual assault; among other things, he obtained a vaginal swab and swabs of dried secretions from JG's abdominal and vaginal areas. Id. at 178, 180, 183.

Back at the salon, police officers established a crime scene, id. at 198, and focused on collecting evidence from the bathroom, id. at 207. Among other evidence, the officers recovered two palm prints from the bathroom sink. Id. at 209, 216. Detective Arthur Connolly ("Connolly") subsequently analyzed the prints and entered them into the police database, which

provided Winkfield as a candidate match. Id. at 290-91. After physically comparing the crime scene prints with Winkfield's prints, Connolly concluded that there was a match of which he was "one hundred percent certain." Id. at 292. Two other examiners also independently reviewed the data and concurred in Connolly's determination. Id. at 292. Although Connolly stated that he did not examine any "elimination prints," id. at 306, which is usually done to ensure that the prints attributed to a defendant did not really come from another individual who had access to the crime scene, he also testified that elimination prints were not necessary in light of his analysis, id. at 309.

In addition, Rawlston Crowther ("Crowther"), a "criminalist level three" employed by the Office of the Chief Medical Examiner of New York City, id. at 366, conducted DNA testing of the evidence from the crime. Id. at 365-66. Among other things, he analyzed two oral swabs taken from Winkfield, the swabs from JG's sexual assault kit, and three swabs taken from the hammer that Cruceta had found in the salon after the crime. Id. at 374-78. With respect to the swabs from JG's rape kit, Crowther testified:

> [O]ne of the dried secretion swabs 1A2 had a clean male DNA profile that was the same as a DNA profile of Marvin Winkfield. The vaginal swab sperm fractions had a mixture of DNA that was consistent with the DNA profile of Marvin Winkfield and [JG]. And dried secretion swab 1A1, that was consistent with that of Marvin Winkfield and [JG].

Id. at 389. Explaining the statistical calculations he had performed to ascertain the rarity of Winkfield's DNA profile, Crowther attested, "It's one in greater than a trillion. . . . [W]e would have to look at 167 planet earths to find this DNA profile one time." Id. at 381.

As for the swabs from the hammer, Crowther testified, "On two of the swabs, the swab hammer handle had DNA profile is of Marvin Winkfield. The flat portion of the hammer head had a DNA profile of [JG] and on the chisel portion of the hammer, there was also DNA profile

5

of [JG]." Id. at 394; accord id. at 396-97, 399. Crowther also performed statistical analyses on the hammer DNA data and concluded that "the results was one in greater than a trillion." Id. at 394, 398.

### 2. Winkfield's apprehension and confession

After learning that the palm prints from the crime scene matched those of Winkfield, police officers investigated petitioner's thereabouts. Id. at 24-25. Detective Joyce Harvin testified that the police contacted Winkfield's family and friends, canvassed hospitals and homeless shelters, spoke to people in the neighborhood, put up wanted posters of Winkfield, generated media attention, and got in touch with the Parole Department and Sex Offenders Monitoring Unit. Id. at 25. In addition, Detective Steven Litwin ("Litwin") testified that the detectives examined phone records and determined that Winkfield was near the downtown bus station in Orlando, Florida. Id. at 254. Litwin then contacted a sergeant in the Orlando Police Department, emailed him Winkfield's photograph, and requested that officers in Orlando try to locate and arrest Winkfield. Id.

At 7:30 p.m. on June 16, 2006, officers from the Orange County Police Department in Florida located Winkfield at the bus terminal in Orlando. Id. at 26-27, 51. The officers arrested Winkfield, placed him in custody at the Orange County Correctional Facility, and notified the New York police. Id. at 28, 51. The very next day, on June 17th, Harvin and her partner, Detective Lindor ("Lindor"), flew to Florida, arriving around 11:00 a.m. Id. The detectives went directly to the Orange County Correctional Facility, where they first met Winkfield at around 2:00 or 2:15 p.m. Id. at 30, 51. Escorted by Detective George Perez ("Perez") from the Orange County Police Department, Harvin and Lindor transported Winkfield to the Orange County Police Department. Id. at 28.

After arriving at the Orange County Police Department, Harvin advised Winkfield of his Miranda rights. Id. at 31. Winkfield waived his rights, and Harvin proceeded to interview him. Id. at 29, 31. Winkfield orally confessed to the June 7, 2006 attack on JG, even though he declined to make a written statement thereafter. Tr. at 32, 34; see generally DVD Tr. Unbeknownst to Winkfield, the entire interview was recorded on video. Id. at 35, 60.

Subsequently, Harvin brought Winkfield back to New York, arriving on June 22, 2006. Id. at 37. At that point, she placed Winkfield under arrest. Id. On February 9, 2007, Litwin conducted a post-indictment lineup. Id. at 257. The lineup consisted of Winkfield and five fillers recruited from a local men's shelter. Id. at 260. Litwin and his partner attempted to find fillers who looked similar to Winkfield "by description, by sex, race, approximate age, skin tone, facial hair, et cetera." Id. at 260. Litwin also had everyone in the lineup "wear baseball caps backwards . . . to [e]nsure uniformity." Id. at 262. Winkfield chose his own position in the lineup. Id. at 262. The investigator hired by Winkfield's attorney was present and did not object to the lineup. Id. JG, who had been told that there was a suspect in custody, came to the police station. Id. at 142, 264-65. Upon viewing the lineup, she identified Winkfield as her attacker. Id. at 108.

## C. Suppression Hearing

On April 30, 2007, the trial judge held a suppression hearing to determine the admissibility of Winkfield's confession, among other evidence. Transcript of April 30, 2007 Hearing ("Hearing Tr.") 1, 32-48, 56-58. Harvin was the only witness to testify during that hearing. Id. at 2-46. The government did not produce any Florida police witnesses to testify as to the circumstances of Winkfield's initial arrest and detention in Orlando, and Harvin testified that she had no personal knowledge of those events. Id. at 34-37.

7

Harvin did, however, testify about Winkfield's appearance and behavior when she first encountered him the Orange County Correctional Facility:

> Q     When you went to take Mr. Winkfield from the correctional facility to the Sheriff's Department, did you observe his physical condition?
> A     Yes, I did.
> Q     And could you tell us how you would describe his physical condition?
> A     Normal.
> Q     Did you notice any marks or bruises on him anywhere?
> A     No.
> Q     Did you notice him walking with a limp or any type of pain?
> A     No, I did not.
> Q     Did he make any complaints about his stay in Florida?
> A     No, he did not.
> Q     Did he make any complaints about being in any type of physical pain whatsoever?
> A     No.

Id. at 45-46.

In addition, Harvin testified that it took only ten minutes for her, Litwin, and Perez to transport Winkfield from the Orange County Correctional Facility to the Orange County Sheriff's Department. Id. at 37. Before doing so, Harvin asked whether Winkfield needed to use the bathroom. Id. at 14. Winkfield did not have to, Harvin recalled, because he had already used the bathroom at the correctional facility. Id. at 14. During the car ride, none of the officers conversed with Winkfield. Id. at 37.

After arriving at the sheriff's department, the officers took Winkfield to a small interview room with no windows. Id. at 13. Only Harvin remained in the room with Winkfield, id. at 38, and she did not have her gun out, id. at 14. Winkfield was restrained by handcuffs, shackles around his arms, and a chain around his waist; his legs were left free. Id. at 39.

Harvin testified that her first real conversation with Winkfield was captured on the video recording. Id. at 40. After Perez turned on the video camera, Harvin identified herself, explained that she was with the New York City Police Department, and told Winkfield that she

8

was there because of an incident that had happened in Brooklyn. Id. at 13-14. The interview then proceeded as follows:

> Q        Now, once you identified yourself and told him why you were there, did you read Mr. Winkfield Miranda Warnings?
> Q        Yes, I did.
> . . . .
> Q        And then did you start speaking to him immediately after reading him Miranda?
> A        Yes.
> Q        And was there anyone else present in the room when you spoke to him after reading him Miranda?
> A        No.
> Q        Now, when you read Mr. Winkfield these Miranda rights, did he appear to understand everything that you were saying regarding his rights?
> A        Yes, he did.
> Q        . . . . Can you describe his physical appearance at the time that you were speaking to him and you read him his Miranda?
> A        Normal.
> Q        Did he make any complaint about his physical condition?
> A        No, he did not.
> Q        And can you tell us about his mental state, was he calm or excited?
> A        He was calm.
> Q        Now, before questioning him regarding the incident, did you make him any promises?
> A        No, I did not.
> Q        Did you threaten him in any way?
> A        No.
> Q        Now, can you tell us approximately what time your interview was after reading Miranda began?
> A        Immediately after.
> Q        And at any point while he was speaking to you, did he ask for an attorney?
> A        No.
> Q        Did he indicate whether he wanted to stop talking to you?
> A        No.
> Q        Can you tell us approximately how long was your interview with Mr. Winkfield?
> A        Approximately 40, 45 minutes.
> Q        Now, did you memorialize your conversation in any way after speaking with the defendant?
> A        Yes.
> Q        And how did you do that?
> A        Video.

Id. at 14, 18-19. In addition, Harvin recalled that she offered Winkfield food during the course

9

of the interview. Id. at 14, 39-40.

The trial judge found Harvin to be credible. Id. at 55. Based on her testimony and his review of the videotaped interview, the judge determined that Winkfield had confessed voluntarily and that the confession was therefore admissible. Id. at 56-57.

## D. Trial

In August 2007, Winkfield was tried by jury in the Supreme Court of the State of New York, Kings County. Dkt. #1, at 1. At trial, the government introduced physical evidence, including the palm print and DNA evidence, accompanied by expert testimony, linking Winkfield to the crime. In addition, the government called as witnesses JG and various New York police officers involved in investigating the crime.

### 1. Winkfield's confession

Winkfield did not testify at trial. Tr. at 440. However, Harvin summarized Winkfield's confession, id. at 32, and the government also played the videotaped interview for the jury, id. at 35. During the interview, Winkfield recounted the details of the attack and admitted that he was the perpetrator. See generally DVD Tr. However, petitioner insisted that he did not intend to attack JG until after he had already entered the salon. Specifically, he claimed, "[M]y intentions were just to, uh—just to get the umbrella and then just, you know, uh—just kinda just walk out." Id. at 9. Referring to the moment when JG walked past him to retrieve his umbrella, petitioner asserted, "Something just came over me." Id. at 10. In addition, Winkfield explained that religious reasons had impelled him to confess: "I know that what I done is wrong, and that's why I told the truth here today, because the lord said the truth gonna make me free . . . ." Id. at 26.

The prosecutor called Harvin to testify about the circumstances under which she first encountered and interviewed Winkfield. Id. at 28-34. Harvin's statements were consistent with

her testimony at the suppression hearing. Among other things, she recalled that she first met Winkfield at the Orange County Correctional facility and then, along with Lindor and Perez, transported him to the Orange County Sheriff's Department. Id. at 50-53. According to Harvin, the officers did not converse with petitioner during the car ride. Id. at 53, 57.

Harwin testified that the first time she really spoke to Winkfield was during the videotaped interview. Id. at 54. Lindor and Perez watched the interview from an adjourning room and did not speak to Winkfield beforehand. Id. at 54-55. When questioned about the voluntariness of Winkfield's statements, Harvin testified as follows:

> Q.    Can you describe the defendant's physical appearance while you were speaking with him?
> A.    Normal, well.
> Q.    Did he make any complaints about his physical condition?
> A.    No, he did not.
> Q.    Before questioning him, did you make any promises to him?
> A.    No.
> Q.    Before questioning him, did you threaten him in any way?
> A.    No, I did not.
> Q.    Now, I believe you testified that the interview began at approximately 2:15 in the afternoon; is that correct?
> A.    Yes.
> Q.    Can you tell us approximately what time did it conclude?
> A.    Approximately 45, 50 minutes later.

Id. at 32-33. In addition, Harvin stated that she did not bring her gun into the interview. Id. at 58. The transcript of the interview shows that Winkfield told Harvin that he had eaten earlier that day, DVD Tr. 26, and that he declined to drink water when Harvin offered, id. at 7, 36. Although Winkfield was wearing hospital clothes, Harvin did not inquire into whether he had been to the hospital or needed medical attention the night before. Id. at 56. At the same time, Harvin testified that Winkfield never asked for medical attention either before or after the interview. Tr. 58.

Upon cross-examination, Harvin made clear that she had no personal knowledge of

11

Winkfield's apprehension and detention by the Florida police, which occurred before she first met petitioner at the Orange County Correctional Facility. Id. at 50-56. The prosecution did not introduce any Florida police witnesses to testify to those events.

## 2. The jury instructions on burglary

Following summation by both parties, the trial judge proceeded to instruct the jury. Of particular relevance here, the judge gave instructions on the two counts of burglary—instructions to which neither party objected.[3]

With respect to the first burglary count, the court instructed, in relevant part:

> Burglary in the second degree as charged in the third count is as follows.
> Under our law a person is guilty of burglary in the second degree when that person knowingly remains unlawfully in a building with the intent to commit a crime therein, and when in effecting entry or while in the building or immediate flight therefrom, that person uses or threatens the immediate use of a dangerous instrument.
> . . . .
> A person who, regardless of his or her intent remains in premises which at the time open to the public does so with license and privilege unless he or she defies a lawful order [not] to remain personally communicated to him or her by the owner of such premises or other authorized person.
> A person who remains unlawfully in a building when that person has no license or privilege to remain in that building. To have no license or remain is to have no right, permission or authority to do so. A person, excuse me, knowingly remains unlawfully in a building when that person is aware that he or she is remaining in such building without license or privilege to do so.
> Intent means conscious objective or purpose. Thus, a person has the intent to commit a crime in a building when that person's conscious objective or purpose is to com[m]it a crime in that building. The crime of burglary is separate and distinct from any crime which a person may commit within the building. The crime of burglary is complete when a person knowingly remains in a building unlawfully and does so with the intent to commit a crime in the building regardless of whether that person ever commits or attempts to commit the crime, any crime in the building.
> . . . .
> In order to find the defendant guilty of this crime, the People are required

---

[3] The two counts differed insofar as one is charged when the defendant "[c]auses physical injury to any person who is not a participant in the crime," N.Y. Penal L. § 140.25(1)(b), whereas the other is charged when the defendant "[u]ses or threatens the immediate use of a dangerous instrument," id. § 140.25(c). This distinction between the two counts is not relevant here.

to prove from all the evidence in the case, beyond a reasonable doubt, each of the following four elements. That on or about June 7, 2006 in the County of Kings, the defendant, Marvin Winkfield, <u>unlawfully remained</u> in a building located at 578, 52nd Street;

      Two, that the defendant did so knowingly.

      Three, that the defendant did so with the intent to commit a crime in the building.

<u>Id.</u> at 508-11 (emphases added).

With respect to the second burglary count, the court instructed, in relevant part:

      Under our law a person is guilty of burglary in the second degree when that person knowingly <u>remains unlawfully</u> in a building with the intent to commit a crime therein and when in effecting entry or while in the building or immediate flight therefrom, that person causes physical injury to any person who is not a participant in the crime.

. . . .

      A person <u>remains unlawfully</u> in a building, excuse me, a person who <u>remains</u> regardless of his or her intent, <u>remains</u> upon premises which are at the time open to the public, does so with license or privilege unless he or she <u>defies a lawful order not to remain</u>, personally communicated to him by the owner of such premises or other authorized person.

      It's the same as the statute before that I read to you as the third count. A person who <u>remains unlawfully</u> in a building that that person has no license or privilege to <u>remain</u> in the building. To have no license or privilege to <u>remain</u>, no right permission or authority to do so and that is the same as it was in the third count submitted.

      A person knowingly <u>remains unlawfully</u> in a building when that person is aware that he or she is <u>entering, remaining,</u> in such building without license or privilege to do so.

      Intent means conscious objective or purpose. Thus, a person has the intent to commit a crime in a building when that person's conscious objective or purpose is to commit a crime in the building. The crime of burglary is separate and distinct from the crime which the person may commit while in the building.

      The crime of burglary is complete when a person knowingly <u>enters or remain</u> [sic] in a building unlawfully and does so with the intent to commit a crime in the building regardless of whether the person ever commits or even attempts to commit any crime in the building.

. . . .

      In order for you to find the defendant guilty of this crime, the People are required to prove from all the evidence in the case, beyond a reasonable doubt, each of the following four elements.

      That on or about June 7, 2006 in the County of Kings, the defendant, Marvin Winkfield, <u>unlawfully remained</u> in a building located at 578 52nd Street, that the defendant did so knowingly, that the defendant did so with the intent to

commit a crime in the building.

Id. at 512-14 (emphases added).

### 3.    Winkfield's convictions

Ultimately, the jury convicted Winkfield of (1) one count of Rape in the First Degree,

N.Y. Penal Law § 130.35(1); (2) two counts of Burglary in the Second Degree, id. § 140.25; (3)

two counts of Assault in the Second Degree, id. § 120.05; and (4) one count of Criminal

Possession of a Weapon in the Fourth Degree, § 265.01. Dkt. #1, at 1; Tr. 531-33.

### E.    Post-trial Proceedings

Subsequently, petitioner was sentenced to twenty-three years of imprisonment for the

rape count, to run consecutively to twelve years of imprisonment for one of the burglary counts.

Sentencing Transcript ("S. Tr.") 13. These sentences were to run concurrently with concurrent

sentences of twelve years of imprisonment for the remaining burglary count, seven years of

imprisonment for each of the two assault counts, and one year of imprisonment for the weapon

possession count. Id. at 13-14. In total, the trial judge sentenced Winkfield to thirty-five years

of incarceration followed by five years of post-release supervision. Id.

Thereafter, Winkfield appealed his conviction to the New York Supreme Court,

Appellate Division. Br. for Def.-Appellant, People v. Winkfield, No. 07/08936 (N.Y. App. Div.

Feb. 8, 2011). Petitioner first argued that admission of his confession, which the government

had not proved to be voluntary based on a totality of circumstances, violated his right to due

process. Id. at 33-49. Winkfield also argued that he had been denied the effective assistance of

counsel when his trial attorney failed to object to the jury instructions on burglary—instructions

that violated petitioner's right to due process by relieving the government of its obligation to

prove every element of burglary. Id. at 59-63.

14

The state appellate court denied Winkfield's petition. See People v. Winkfield, 935

N.Y.S.2d 130 (App. Div. 2011). Addressing Winkfield's confession, it reasoned, "Contrary to

the defendant's contention, a review of the totality of the circumstances demonstrates that the

defendant's statement was voluntarily made." Id. at 131. The court also rejected Winkfield's

ineffective assistance claim, explaining that "he was not deprived of the effective assistance of

counsel." Id. Winkfield then moved to reargue his appeal, and the Appellate Division denied his

motion. Dkt. # 9-1, at 175. Aff. in Opp'n to Pet. for a Writ of Habeas Corpus ("Resp't's

Opp'n") 28. Finally, Winkfield sought leave to appeal to the New York Court of Appeals, which

denied his request. People v. Winkfield, 18 N.Y.3d 999 (2011).

## II. DISCUSSION

### A. Standard of Review

The Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA") established a

deferential standard that federal habeas courts must apply when reviewing state court

convictions. 28 U.S.C. § 2254(d). The statute provides, in pertinent part:

> (d) An application for a writ of habeas corpus on behalf of a person in custody
> pursuant to the judgment of a State court shall not be granted with respect to any
> claim that was adjudicated on the merits in State court proceedings unless the
> adjudication of the claim–
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable
> application of, clearly established Federal law, as determined by the Supreme
> Court of the United States . . . .
>
> (2) resulted in a decision that was based on an unreasonable determination of the
> facts in light of the evidence presented in the State court proceeding.
>
> (e)(1) In a proceeding instituted by an application for a writ of habeas corpus by a
> person in custody pursuant to the judgment of a State court, a determination of a
> factual issue made by a State court shall be presumed to be correct. The applicant
> shall have the burden of rebutting the presumption of correctness by clear and
> convincing evidence.

Id.

The phrase "clearly established Federal law, as determined by the Supreme Court of the United States" refers to "the holdings, as opposed to the dicta, of [the Supreme] Court's decisions as of the time of the relevant state-court decision." Williams v. Taylor, 529 U.S. 362, 412 (2000). A state court decision is "contrary to" clearly established Supreme Court precedent if "the state court applies a rule that contradicts" Supreme Court precedent or if "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent." Id. at 405-06. With respect to the "unreasonable application" clause, "a federal habeas court . . . should ask whether the state court's application of clearly established federal law was objectively unreasonable." Id. at 409. "Where a state court's decision is unaccompanied by an explanation, the habeas petitioner's burden still must be met by showing there was no reasonable basis for the state court to deny relief." Harrington v. Richter, --- U.S. ---, 131 S. Ct. 770, 784 (2011).

## B.    Ineffective Assistance of Counsel

Winkfield first argues that he was denied the effective assistance of trial counsel when Sheinberg failed to object to burglary instructions that diminished the government's burden of proof. He avers that the state appellate court unreasonably applied Supreme Court law when it concluded that Sheinberg had not been constitutionally ineffective.

### 1.    Legal standard

A petitioner seeking a writ of habeas corpus on ineffective assistance of counsel grounds faces a heavy burden in establishing entitlement to relief. Strickland v. Washington, 466 U.S. 668 (1984), established the two-prong test by which ineffective assistance of counsel claims are adjudicated. Under Strickland, a petitioner must demonstrate, first, that counsel's performance

fell below "an objective standard of reasonableness" under "prevailing professional norms," id. at 688, and second, that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A court need not decide both prongs of the Strickland test if a there is an insufficient showing on one. See id. at 697.

In analyzing a claim that counsel's performance fell short of constitutional standards, the court must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance . . . [and] might be considered sound trial strategy" Id. at 689 (internal quotation marks omitted). In so doing, it must "affirmatively entertain the range of possible reasons [petitioner]'s counsel may have had for proceeding as they did." Cullen v. Pinholster, --- U.S. ---, 131 S. Ct. 1388, 1407 (2011) (citation and internal quotation marks omitted).

Moreover, when ineffective assistance of counsel claims are presented on collateral habeas review, the court assesses them subject to the strictures of AEDPA and must be "doubly deferential" in reviewing the state court's determination that counsel acted effectively. Knowles v. Mirzayance, 556 U.S. 111, 123 (2009) (citing Yarborough v. Gentry, 540 U.S. 1, 5-6 (2003) (per curiam)); see 28 U.S.C. § 2254(d). To prevail on an ineffective assistance of counsel claim on habeas review, a petitioner must show not only that counsel's performance fell below the Strickland standard but also that the state court's adjudication of the Strickland standard was itself unreasonable. See Richter, 131 S. Ct. at 785. Stated differently, the court may afford habeas relief only upon a finding that the state court was unreasonable—and not merely incorrect—in concluding that counsel's performance did not fall below an objective standard of reasonableness or that petitioner was not prejudiced. See id.

## 2.    Analysis

Before engaging with Winkfield's argument, I first explain the relevant portions of New York law on burglary and then explicate petitioner's contention in some detail.

### i.    Second degree burglary under New York law

Under New York Penal Law § 140.25, "[a] person is guilty of burglary in the second degree when he knowingly enters or remains unlawfully in a building with intent to commit a crime therein . . . ." N.Y. Penal L. § 140.25 (emphases added). In People v. Gaines, the New York Court of Appeals held that unlawful entry and unlawful remaining are mutually exclusive theories that establish the requisite element of criminal trespass. See 546 N.E.2d 913, 915-16 (N.Y. 1989).

Unlawful entry is accomplished when a person enters premises that are closed to the public, without the consent of the owner or another authorized individual. See N.Y. Penal L. § 140.00(5) (providing that a person lawfully enters premises when those premises are open to the public); People v. Graves, 555 N.E.2d 268, 269 (N.Y. 1990) (noting that a person lawfully enters premises that are not open to the public when he obtains consent from the "the owner or another whose relationship to the premises gives him authority to issue such consent"). A person unlawfully enters premises that are closed to the public, moreover, when he obtains consent to enter through "trick, fraud, or deceit." People v. Thompson, 501 N.Y.S.2d 381, 383 (App. Div. 1986) (internal quotation marks omitted). In contrast, to be guilty of burglary for unlawful remaining, a defendant must have entered lawfully but then remained for the purpose of committing a crime after he is no longer authorized to be on the premises. Gaines, 546 N.E.2d at 915.

In addition, Gaines held that to be guilty of burglary, a defendant must harbor the intent

to commit a crime (other than the crime of trespass) <u>at the same time</u> that he commits the criminal trespass:

> In order to be guilty of burglary for unlawful remaining, a defendant must have entered legally, but remain for the purpose of committing a crime after authorization to be on the premises terminates. And in order to be guilty of burglary for unlawful entry, a defendant must have had the intent to commit a crime at the time of entry. In either event, contemporaneous intent is required.

<u>Id.</u> at 915-16. Accordingly, a defendant who enters a building lawfully cannot be guilty of burglary if he forms the intent to commit a crime only after he has already entered, <u>see id.</u>— unless he subsequently "defies a lawful order not to . . . remain, personally communicated to him by the owner of such premises or other authorized person," N.Y. Penal L. § 140.00(5). Under the latter circumstance, the defendant can be convicted under a theory of unlawful remaining, assuming he possesses the requisite criminal intent.

Of significance here, New York law—both currently and at the time of Winkfield's trial—has been unsettled as to what constitutes a "lawful order not to . . . remain," <u>id.</u> In two published cases, the Appellate Division indicated that no explicit order to leave is necessary; instead, individuals can, through their actions, communicate an order to leave. <u>See People v. Burnett</u>, 614 N.Y.S.2d 34 (App. Div. 1994); <u>People v. DeLarosa</u>, 568 N.Y.S.2d 47 (App. Div. 1991).

First, in <u>People v. Burnett</u>, the Appellate Division affirmed a defendant's conviction for burglary through unlawful remaining where the defendant had obtained permission from an apartment's resident to enter the dwelling but then proceeded to attack the resident. 614 N.Y.S.2d at 34. Justifying its decision, the court reasoned, "The defendant's authorization to lawfully remain in the apartment terminated . . . when she took the victim's money, and then hit her in the face with a shoe and tied her up with [an] electrical cord when the victim threatened to

19

call the police." Id. Notably, the Burnett court did not identify any evidence that the victim had explicitly told the defendant to leave.

Similarly, in People v. DeLaRosa, the Appellate Division affirmed a defendant's conviction for burglary on a theory of unlawful remaining where the victim repeatedly asked a friend to call the police while the defendant beat the victim and attempted to rape her. 568 N.Y.S.2d at 48-49. As the court explained, "Even if defendant's argument is credited that he was permitted entry, . . . the evidence makes clear that the victim unequivocally withdrew any license to remain." Id. at 49. As in Burnett, there is no evidence that the victim ever issued an explicit, verbal order for the defendant to leave the premises.

In People v. Hutchinson, however, the New York Supreme Court reached the opposite conclusion. Specifically, the Hutchinson court held that a defendant who enters a building lawfully does not thereby remain unlawfully simply because he commits a crime in the presence of the individual who consented to his entry. 477 N.Y.S.2d 965, 967-68 (S. Ct. 1984). As the court explained:

> This is not to say that one who initially enters private premises with consent never remains unlawfully so as to incur liability for burglary. But there must be something more to establish termination of license than the commission of a criminal act or an order to leave after a criminal intention is manifested. Thus, in this case, if the jury were to conclude that the defendant was in the apartment with the complainant's true consent, her command that he leave after he displayed the knife would not constitute a revocation of license sufficient to convert a lawful entry into an unlawful remaining. To hold otherwise would broaden the scope and reach of the burglary statute beyond the Legislature's intention.

Id. at 968. I need not resolve the conflicting holdings in Burnett and DeLaRosa on the one hand, and Hutchinson on the other, to adjudicate Winkfield's petition. Instead, it is sufficient to note the unsettled nature of what constitutes defying a lawful order to remain under New York law.

Finally, the New York Court of Appeals also established in <u>Gaines</u> that a trial court errs when it charges either theory of criminal trespass when there are no facts to support that particular theory. <u>See</u> 546 N.E.2d at 916 ("The court should not have referred to unlawful remaining in its burglary charge, since the situation to which that language applies was not present in the case.")[4]; <u>accord</u> People v. Mercedes, 651 N.Y.S.2d 456, 457 (App. Div. 1996) ("[W]here a case involves 'unlawful entry' and not 'unlawful remaining,' the court should omit any reference to 'remains unlawfully' from its charge."). This is not to say, however, that a court can never charge both theories in a single case; if the facts can support either theory, then it may be appropriate to charge both. <u>See</u> People v. Roberts, 557 N.Y.S.2d 127, 129 (App. Div. 1990) ("There is <u>no proof</u> in the present case from which it could be inferred that the defendant's entry onto the premises in question was legal. . . . . The . . . 'or remains' language should have been omitted from the charge.") (emphasis added) (internal citation omitted); People v. Santiago, 551 N.Y.S.2d 146, 146 (App. Div. 1990) ("The court should not have referred to unlawful remaining in its burglary charge since <u>the situation to which that language applies was not present</u> in this case.") (emphasis added).

### ii.   Winkfield's argument

Winkfield's challenge focuses on the trial judge's second burglary instruction, which twice mentioned the concept of unlawful "entry" while otherwise focusing on a theory of unlawful "remaining." Pet'r's Mem. 24-36; Pet'r's Reply 5-9. In the first instance, the court instructed, "A person knowingly remains unlawfully in a building when that person is aware that

---

[4] <u>Gaines</u> involved a defendant who broke into a building supply company at night to, according to his testimony, seek refuge from the cold and snow. <u>Id.</u> at 914. When the defendant was arrested the next day, he was found wearing over his own clothes "coveralls and a jacket that belonged to a company employee; pens bearing the company name were in the jacket pocket." <u>Id.</u> At trial, the court instructed "that the jury could find defendant guilty of burglary if, at the time of his knowingly unlawful entry or remaining, defendant intended to commit a crime in the building." Because someone can unlawfully remain in a building only after <u>lawfully</u> entering, and because it would have been impossible for a reasonable juror to find that the defendant had lawfully entered the building, the <u>Gaines</u> court held that the trial court erred in charging the jury on unlawful remaining.

he or she is <u>entering, remaining,</u> in such building without license or privilege to do so." Tr. 513 (emphasis added). In the second instance, the court continued, "The crime of burglary is complete when a person knowingly <u>enters or remain</u> [sic] in a building unlawfully and does so with the intent to commit a crime in the building . . . ." <u>Id.</u> (emphasis added).

Because unlawful entry and remaining are mutually exclusive theories, Winkfield maintains, the trial court erred in instructing the jury on both—in such a way that rendered unclear that criminal trespass must coincide temporally with criminal intent. Specifically, he contends that the instructions, as given, may have allowed a juror to convict him for burglary based on a finding that he (1) entered the salon unlawfully and (2) formed the intent to commit a crime only <u>after</u> he had already entered. A conviction based on these findings would contravene <u>Gaines</u>, which explicitly held that "to be guilty of burglary for unlawful entry, a defendant must have had the intent to commit a crime at the time of entry." 546 N.E.2d at 915. By allowing a jury to convict him without a finding of <u>simultaneous</u> criminal trespass and criminal intent, Winkfield argues, the jury instruction unconstitutionally relieved the prosecution of its burden to prove all the elements of burglary. <u>See</u> <u>In re Winship</u>, 397 U.S. 358, 364 (1970) ("[W]e explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.").

Winkfield contends that the state appellate court unreasonably applied <u>Strickland</u> in holding that Sheinberg's performance was not ineffective. With respect to the deficiency prong of <u>Strickland</u>, petitioner argues that defense counsel's failure to object to the jury instructions was constitutionally deficient, because it could "only be explained as an unreasonable failure to know the applicable law." Pet'r's Mem. 24. In other words, "[t]here could be no strategic

22

reason for permitting his client to be convicted under a lower standard of proof." Id. As for the prejudice prong of Strickland, petitioner contends that he was prejudiced by the erroneous instructions because:

> Under a correct charge, there was a reasonable probability that petitioner would not have been convicted of burglary. The evidence did not support a theory of unlawful entry, where the complainant testified that the salon was open when she gave petitioner permission to enter. Nor did it support a theory of unlawful remaining, where the complainant never issued an order to leave.

Id. at 24-25.

Notably, Winkfield's argument that the evidence did not support a theory of "unlawful remaining" rests on the interpretation of that term advanced in Hutchinson: that a defendant who enters a building lawfully does not thereby remain unlawfully simply because he commits a crime in the presence of the individual who consented to his entry. See 477 N.Y.S.2d at 967-68. In particular, Winkfield maintains that JG never communicated a "lawful order" that he not remain in the salon despite her screaming, struggling, and resistance. He thus challenges the government's interpretation of the term "lawful order" to encompass actions that implicitly communicate the victim's intent that the defendant leave the premises. See Resp't's Opp'n 20-21. According to Winkfield, the government's theory contravenes New York case law.[5]

### iii.     The Appellate Division did not unreasonably apply Strickland

The state appellate court concluded that Winkfield was not denied the effective assistance of counsel despite Sheinberg's failure to object to the second set of burglary instructions. See People v. Winkfield, 935 N.Y.S.2d at 131.

---

[5] Winkfield also argues that the Appellate Division made an unreasonable determination of fact insofar as it concluded that JG had issued Winkfield an order to leave. See Pet'r's Br. 39. However, whether or not JG's screaming, struggling, and resistance constituted an order to leave under New York precedent is a question of law rather than one of fact.

### a.   Deficiency

The conclusion that Sheinberg's performance was not deficient was not unreasonable in light of the "well established proposition" that errors in jury instructions must be examined in light of the charge as a whole. See Cupp v. Naughten, 414 U.S. 141, 146-47 (1973). The Supreme Court has explained in a related context:

> In a criminal trial, the State must prove every element of the offense, and a jury instruction violates due process if it fails to give effect to that requirement. Nonetheless, not every ambiguity, inconsistency, or deficiency in a jury instruction rises to the level of a due process violation. The question is whether the ailing instruction . . . so infected the entire trial that the resulting conviction violates due process. [A] single instruction to a jury may not be judged in artificial isolation, but must be viewed in the context of the overall charge. If the charge as a whole is ambiguous, the question is whether there is a reasonable likelihood that the jury has applied the challenged instruction in a way that violates the Constitution.

Middleton v. McNeil, 541 U.S. 433, 436-37 (2004) (per curiam) (alterations in original) (internal citations and quotation marks omitted).

Here, Winkfield does not argue that defense counsel should have objected to the jury instructions on the first burglary count. For that count, the judge provided an accurate instruction on unlawful remaining without ever mentioning unlawful entry. Instead, Winkfield contends that Sheinberg should have objected to the instructions for the second burglary count—specifically to the trial judge's two references to unlawful entry in instructions that otherwise focused on unlawful remaining.

When the judge proceeded with instructions for the second burglary count, he explained that the difference between the two counts was that former involved the use or threat of use of a dangerous instrument whereas the latter involved the causation of physical injury to a victim. Tr. 511 ("The difference in this particular count as one before it, there is no dangerous instrument."), 514 ("[T]he People are required to prove . . . that the defendant caused physical injury to a

24

person who was not a participant in the crime."); compare N.Y. Penal L. § 140.25(1)(b), with id. § 140.25(1)(c). And when the judge reached the portion of the instructions on the element of criminal trespass, he twice emphasized that the instructions on unlawful remaining were the same as those for the previous burglary count—for which he had provided correct instructions on unlawful remaining. Tr. 513.

Any juror who noticed the discrepancies between the two sets of burglary instructions would have likely compared those instructions and concluded that the former was correct. While the second burglary instructions do twice mention unlawful entry, they by and large explicate the concept of unlawful remaining. This, combined with the exclusive focus on unlawful remaining in the first set of burglary instructions, strongly suggest that a juror would have disregarded the two mentions of unlawful entry in the second set of instructions.

"[A]ffirmatively entertain[ing] the range of possible reasons [petitioner]'s counsel may have had for proceeding as he did," Pinholster, 131 S. Ct. at 1407 (internal quotation marks omitted), it is moreover possible that Sheinberg had a strategic reason for not objecting to the two mentions of unlawful entry: to avoid drawing both the prosecutor's and jury's attention to a theory of unlawful entry—a theory under which Winkfield may well have been convicted. Cf. United States v. Grunberger, 431 F.2d 1062, 1069 (2d Cir. 1970) ("[I]t is understandable that a defense counsel may wish to avoid underscoring a prejudicial remark in the minds of the jury by drawing attention to it."); Gilmore v. Lewin, No. 9:05-CV-1378, 2007 WL 3274863, at *3 (N.D.N.Y. Nov. 5, 2007) ("The decision whether to object, to avoid calling any additional attention to potentially damaging statements, is encompassed within the category of strategic legal decision-making.").

As discussed, criminal trespass is a requisite element of burglary under New York law

and can be established through either unlawful entry or unlawful remaining. See Gaines, 546 N.E.2d at 915-16. Here, aside from his two interjections of the word "entry" in instructions otherwise focused on unlawful remaining, the trial judge never instructed the jury on unlawful entry—even though there was substantial evidence to support such a theory. Indeed, the government's primary theory at trial appeared to be one of unlawful entry, insofar as the prosecutor elicited evidence that the salon was closed to the public and that Winkfield lied to JG about "Tina" to gain entry. The prosecutor, however, never objected to the omission of instructions on unlawful entry, even though it would have been to the government's advantage to do so.

Although JG's testimony was somewhat ambiguous as to whether the salon was open or closed for business, there is a reasonable possibility that a juror would have concluded based on Cruceta's testimony, as well as JG's assertion that the door was deadbolted, that the salon was in fact closed to the public that day. Insofar as Winkfield's license to be in the salon was based on JG's consent, that consent was vitiated by the lie that petitioner used to gain entry. See Thompson, 501 N.Y.S.2d at 383. As Winkfield confessed, he told JG that he wanted to make a hair appointment for his wife "Tina"—an entirely fictitious individual. DVD Tr. 6, 8. JG, in turn, testified, "I opened the door because he said he wanted to make an appointment for his wife." Tr. 85. Furthermore, although Winkfield claimed that he did not form an intent to commit a crime until after he had already entered the salon, a juror could well have concluded otherwise based on the uncontroverted fact that Winkfield lied to gain entry after seeing JG alone in the salon.

Given that the evidence supported a theory of unlawful entry, defense counsel may have strategically chosen not to draw attention to the trial judge's two single references to that concept

26

in instructions that otherwise focused on unlawful remaining. Had Sheinberg drawn attention to the theory of unlawful entry, the prosecutor may have demanded thorough instructions on that theory—including instructions on the principle that deceit or artifice vitiates the lawfulness of a consented-to entry.

Better to hope, Sheinberg may have thought, that the jury would acquit Winkfield on a theory of unlawful remaining, given that (1) Winkfield never defied an explicit verbal order from JG to leave the premises, and (2) it was unclear under New York law whether, in the absence of such an explicit verbal order, a defendant unlawfully remains on premises that he lawfully entered. Cf. Lockhart v. Fretwell, 506 U.S. 364, 371 (1993) ("We held [in Strickland] that in order to determine whether counsel performed below the level expected from a reasonably competent attorney, it is necessary to 'judge . . . counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct.'") (quoting Strickland, 466 U.S. at 690)); Upchurch v. Bruce, 333 F.3d 1158, 1166 (10th Cir. 2003) (holding that counsel was not ineffective for failing to raise an argument on direct appeal, given that the argument "would not have been plainly meritorious" given the unsettled nature of state law); Lucas v. Johnson, 132 F.3d 1069, 1079 (5th Cir. 1998) (holding that defendant failed to demonstrate deficient performance insofar as counsel failed to object to the state's lack of corroborating evidence of an underlying sexual assault, where, at the time of trial, it was unclear whether corroborating evidence was necessary to support a conviction based on extrajudicial confessions); Love v. Smith, No. CV–08–3746 (BMC), 2009 WL 2422384, at *7 (E.D.N.Y. Aug. 6, 2009) ("Because there is no clear state rule on whether the stop-consideration language must be included, counsel's decision not to object to the justification charge did not constitute ineffective assistance, and this Court therefore cannot hold that the Second Department's ineffective

27

assistance determination was either contrary to, or an unreasonable application of, the Strickland standard.").

Alternatively, trial counsel may have calculated as follows: even if Winkfield were convicted on a theory of unlawful remaining, he would stand a reasonable chance of having that conviction overturned on direct appeal based on the unsettled nature of New York as to what constitutes unlawful remaining. As discussed, it was and remains unclear whether a victim's actions alone can constitute an order to leave the premises, the defiance of which would qualify as unlawful remaining. In contrast, the New York law on unlawful entry is clear, and a burglary conviction on that theory would have been a reasonable possibility in this case and significantly more difficult to challenge on this record.

Under these circumstances, it was not unreasonable for the Appellate Division to conclude that counsel's performance was not deficient under Strickland for failing to object when the trial judge twice briefly mentioned unlawful "entry" while providing burglary instructions that otherwise focused on unlawful remaining.

### b. Prejudice

However, even if the Appellate Division acted unreasonably in concluding that Sheinberg's failure to object was not deficient, it reasonably decided that Winkfield was not prejudiced by defense counsel's performance.

Winkfield argues that "[u]nder a correct charge, there was a reasonable probability that petitioner would not have been convicted of burglary." Pet'r's Mem. 24. Here, a "correct charge" would have included separate instructions on lawful entry and unlawful remaining—with an explanation that, in either case, the trespass had to coincide temporally with the requisite criminal intent.

28

Petitioner insists that "[t]he evidence did not support a theory of unlawful entry, where the complainant testified that the salon was open when she gave petitioner permission to enter." However, JG's testimony was ambiguous as to whether the salon was open to customers: "I went to the door and I told him we were closed and he said no, it's open. You know, I told him we were open, but it's closed . . . ." Tr. 85. In addition, JG asserted that she had to remove a deadbolt to permit Winkfield to enter, suggesting that the store was not open for business. Id. Moreover, Cruceta unambiguously testified that the salon was closed for business that day because she, the hairdresser, was away. Id. at 159. A juror could have thus reasonably concluded that the salon was closed to customers. The facts would have then compelled a conclusion that Winkfield entered unlawfully, because the uncontroverted evidence established that he lied to JG to gain entry. See Thompson, 501 N.Y.S.2d at 383 (holding that "trick, fraud, or deceit" vitiates consent to entry, thereby rendering the entry unlawful). Furthermore, a juror could have reasonably inferred from Winkfield's lie that he intended to commit a crime at the time of entry.

In addition, petitioner argues that the evidence did not "support a theory of unlawful remaining, where the complainant never issued an order to leave." Pet'r's Mem. 24. However, as discussed, New York law is unclear as to whether JG's struggling, screaming, and resistance constituted an order to leave. Because JG's conduct may well have constituted an order to leave under New York law, a jury could have properly convicted Winkfield based on a theory of unlawful remaining. Notably, the one New York case that supports Winkfield's interpretation of unlawful remaining was issued by the New York Supreme Court, whereas the two that held otherwise were decided by the Appellate Division. Compare Hutchinson, 477 N.Y.S.2d 965, with Burnett, 614 N.Y.S.2d 34, DeLaRosa, 568 N.Y.S.2d 47. Citing both Burnett and DeLaRosa

29

in rejecting Winkfield's direct appeal, the Appellate Division implicitly concluded that the weight of authority did not favor petitioner's interpretation of what constitutes unlawful remaining. See People v. Winkfield, 935 N.Y.S.2d at 131.

Under these circumstances, the Appellate Division was not unreasonable in determining that Winkfield was not prejudiced by trial counsel's failure to object to the burglary instructions as given.

## C.    Admission of Winkfield's Confession

Winkfield also argues that the government failed to prove the voluntariness of his confession based on a totality of circumstances, insofar as the prosecution adduced no evidence as to his initial arrest and nineteen-hour detention by the Florida police. On this basis, Winkfield maintains that admission of his confession at trial violated his right to due process, and that the state appellate court made both an unreasonable determination of fact and an unreasonable application of law in concluding that his confession was voluntary.

### 1.    Legal Standard

The Supreme Court has held that the admission of a confession into evidence comports with due process only if the totality of circumstances reflects that the defendant voluntarily confessed. See Dickerson v. United States, 530 U.S. 428, 434 (2000). The relevant circumstances are not limited to the questioning that produced the confession, but also include the arrest and preceding detention. See, e.g., Haynes v. Washington, 373 U.S. 503, 514 (1963); Reck v. Pate, 367 U.S. 433, 441-42 (1961); Malinski v. People, 324 U.S. 401, 404-05 (1945). In addition, it is well-established that the prosecution bears the burden of proving that a defendant confessed voluntarily. See Tague v. Louisiana, 444 U.S. 469, 470-71 (1980).

Admission of an involuntary confession into evidence is constitutional error that requires

reversal of the conviction if the erroneous admission "'had substantial and injurious effect or influence in determining the jury's verdict.'" Wood v. Ercole, 644 F.3d 83, 93 (2d Cir. 2011) (quoting Brecht v. Abrahamson, 507 U.S. 619, 637 (1993)).  Because "the defendant's own confession is probably the most probative and damaging evidence that can be admitted against him," a reviewing court should "exercise extreme caution before determining that the admission of the confession at trial was harmless." Arizona v. Fulminante, 499 U.S. 279, 296 (1991) (internal quotation marks omitted).

In assessing whether the erroneous admission of a confession "had a substantial and injurious effect on the jury's decision, [a court considers] the importance of the . . . wrongly admitted [evidence], and the overall strength of the prosecution's case." Wray v. Johnson, 202 F.3d 515, 526 (2d Cir. 2000) (citing Brecht, 507 U.S. at 639).  The significance of wrongly admitted evidence "is determined by the prosecutor's conduct with respect to the . . . evidence, whether the evidence bore on an issue . . . plainly critical to the jury's decision, and whether [it] was material to the establishment of the critical fact, or whether it was instead corroborated and cumulative." Wood, 644 F.3d at 94 (internal citations and quotation marks omitted) (alterations in original).

### 2.    Analysis

Contrary to Winkfield's contention, the totality of the circumstances indicates that his confession was voluntary.  Even if it was not, admission of the confession into evidence was harmless under Brecht.

### a.    Voluntariness of Winkfield's confession

Winkfield contends that the state court "could not make a voluntariness determination when it was missing critical facts about the totality of the circumstances." Pet'r's Reply 18.  In

31

particular, he maintains that the People "provided no information at the suppression hearing about the circumstances of his arrest or his 19 hours in police custody immediately preceding the interrogation." Pet'r's Mem. 40. Without this information, Winkfield insists, it was unreasonable for the state appellate court to determine that his confession was voluntary. I disagree.

First, the Appellate Division's conclusion was not contrary to clearly established Supreme Court precedent, insofar as "[n]o Supreme Court case has addressed a materially indistinguishable set of facts." Richardson v. Superintendent of Mid-Orange Corr. Facility, 621 F.3d 196, 203 (2d Cir. 2010); see generally Carey v. Musladin, 549 U.S. 70, 76-77 (2006). Winkfield relies on Haynes v. Washington for the proposition that "[w]hen the circumstances surrounding the confession are at issue, it begs the question to rely on the confession itself to show voluntariness," Pet'r's Mem. 43. As the Supreme Court explained in Haynes, "Common sense dictates the conclusion that if the authorities were successful in compelling the totally incriminating confession of guilt, the very issue for determination, they would have little, if any, trouble securing the self-contained concession of voluntariness." 373 U.S. at 513. Petitioner thus argues that even if the videotape of his confession reveals no signs of coercion, it was unreasonable for the state court to conclude that no coercion preceded the confession.

Haynes, however, is materially distinguishable from this case. In Haynes, the petitioner introduced uncontradicted evidence that the police had held him incommunicado for five to seven days prior to his confession, uniformly denied his requests to contact an attorney and call his wife, and repeatedly told him that he would not be allowed to call unless he "cooperated" with the police and provided a written and signed confession admitting participation in the robbery at issue. Id. at 504-12. It was in light of these circumstances that the Supreme Court

32

discredited the statement in Haynes' written confession that no one had induced him to confess through "any promises or threats." Id. at 512.

Consistent with Haynes, every Supreme Court case that has held a confession to be involuntary has involved evidence of coercion by government officials. See, e.g., Reck, 367 U.S. at 441-42 (highlighting record evidence that the petitioner, who had throughout his life been classified as mentally retarded, was denied adequate food; complained of abdominal pain caused by police beatings; grew faint and vomited blood; and, for all practical purposes, was held incommunicado for four days prior to his confession); Malinski, 324 U.S. at 406-07 (identifying record evidence that the petitioner had been held incommunicado; that his request to see a lawyer was denied; and that the prosecutor testified that petitioner "was not hard to break" and "did not care what he did" because "[h]e knew the cops were going to break him down").

Here, in contrast, there are no indicia of coercion to contradict Winkfield's statement that his confession was voluntary. Notably, Winkfield never testified that the Florida authorities employed coercive tactics against him—even though he had ample opportunity to do so at the pretrial suppression hearing. On this record, it was not unreasonable for the state appellate court to infer that Winkfield's will was never "overborne," Dickerson, 530 U.S. at 434, while in the custody of the Florida police. It therefore cannot be said that the state appellate court decided this case differently than the Supreme Court has "on a set of materially indistinguishable facts." Bell v. Cone, 535 U.S. 685, 694 (2002).

Furthermore, it cannot be said that the Appellate Division made an unreasonable determination of the facts. See generally Holland v. Donnelly, 216 F. Supp. 2d 227, 231 (S.D.N.Y. 2002) (holding that, on habeas review, a state court's factual findings as to the circumstances surrounding a confession are entitled to a presumption of correctness under 28

U.S.C. § 2254(e)(1)). This is not a case, as Winkfield suggests, in which the state court "presume[d] from a silent record that a defendant's confession extracted in police custody was voluntary obtained," Pet'r's Reply 17. Although there is no direct evidence concerning Winkfield's Florida arrest and custody, the totality of the circumstantial evidence indicates that the Florida authorities did not subject him to coercive treatment or conditions. Among other things, Winkfield showed no signs of physical injury, made no requests for medical attention, indicated that he had been allowed to eat and use the bathroom, and appeared calm and alert during his subsequent interview with Harvin. Given the record here, Winkfield has failed to meet his burden of rebutting, by "clear and convincing evidence," 28 U.S.C. § 2254(e)(1), the Appellate Division's implicit factual determination that the Florida police never employed tactics to threaten, force, or bribe Winkfield into confessing.

### b.    Harmlessness of admitting Winkfield's confession

Even if the government failed to prove that Winkfield's confession was voluntary, admission of the confession into evidence was harmless in light of the overwhelming evidence of petitioner's guilt.

Although the confession bore on an issue "plainly critical to the jury's decision," Wood, 644 F.3d at 94 (internal quotation marks omitted), the prosecution did not rely heavily on the confession to establish Winkfield's guilt. Significantly, the government built an otherwise strong case against petitioner, based on not only the detailed eyewitness testimony of JG, but also extensive physical evidence, including the palm print data, DNA evidence from the hammer, and DNA evidence from JG's sexual assault kit.

Winkfield attempts to undermine the strength of JG's identification by, for the most part, generally challenging the reliability of stranger identification. Pet'r's Mem. 46-47. However,

34

the record shows that JG had ample opportunity to observe petitioner under calm conditions when he first entered the salon and interacted with her prior to the attack. Cf. United States v. Frampton, 382 F.3d 213, 221-22 (2d Cir. 2004) ("'[T]he testimony of a single, uncorroborated eyewitness is generally sufficient to support a conviction.'") (quoting United States v. Danzey, 594 F.2d 905, 916 (2d Cir. 1979)).

JG's identification was, moreover, corroborated by an abundance of forensic evidence. Connolly concluded, with "one hundred percent certain[ty]," Tr. 292, that the palm prints found in the bathroom matched those of Winkfield. Petitioner insists that "[t]he strong possibility of contamination of the crime scene by the large number of police and other emergency personnel . . . together with Connolly's failure to take any elimination prints rendered his evidence far from overwhelming." Pet'r's Mem. 49. However, Connolly testified that elimination prints were not necessary given the strength of the match between Winkfield's prints and the prints from the crime scene. Tr. 309.

Furthermore, even if the palm print evidence was less than overwhelming, it was strongly bolstered by the DNA evidence. Crowther testified that the DNA from the vaginal swab and two of the dried secretion swabs from JG's sexual assault kit were consistent with Winkfield's DNA. The two swabs from the hammer handle also revealed DNA that matched Winkfield's DNA profile. And Crowther testified to the strength of the DNA evidence by explaining that Winkfield's DNA profile had a rarity of one in greater than a trillion. Id. at 391. Attempting to challenge the DNA evidence, Winkfield underscores that Crowther did not conduct the laboratory tests himself.[6] Pet'r's Mem. 47. While this is true, Tr. 402, 405, 407, 412, Crowther

---

[6] Winkfield was tried before the Supreme Court issued its opinion in Melendez-Diaz v. Massachusetts, 557 U.S. 305 (2009), which held that defendants have a Sixth Amendment right to confront laboratory analysts who conduct the tests that are introduced as evidence against the defendants at trial. Cf. Acevedo v. Lempke, No. 10 Civ. 5285(PAE)(HBP), 2012 WL 360276, at *13 (S.D.N.Y. Feb. 3, 2012) (noting that "the overwhelming weight of

35

testified that three separate analysts performed the tests and that a supervisor checked the work of each analyst. Id. at 405, 407, 412, 414. Crowther further explained that, as the criminologist assigned to the case, he examined all the results from the laboratory, and his work was reviewed by both a supervisor and an assistant director. Id.

On summation, the prosecutor discussed at great length both JG's testimony and the DNA evidence. Tr. 455-80. Her argument presented Winkfield's confession as being supportive of—but not essential to—a conclusion that petitioner was the perpetrator. Although the prosecutor did at one point characterize the confession as "[t]he evidence that eliminates all doubt that it's Marvin Winkfield who committed these crimes," id. at 477 (emphasis added), the clear implication of her argument was that the totality of the other evidence was, on its own, sufficient to eliminate any reasonable doubt.

Upon reviewing the record as a whole, I am satisfied that Winkfield's confession was "corroborated and cumulative" rather than being "material to the establishment of the critical fact," Wood, 644 F.3d at 94, of the perpetrator's identity. I have little doubt—much less a "grave doubt," O'Neal v. McAninch, 513 U.S. 432, 437 (1995)—that admission of the confession did not have a substantial and injurious effect on the jury's verdict given the overall strength of the prosecution's case. I therefore conclude that the admission was harmless under Brecht.

authority holds that Melendez–Diaz is not retroactive to collateral attacks").

## III. CONCLUSION

The petition for a writ of habeas corpus is denied. The Clerk of Court is directed to enter judgment accordingly.

SO ORDERED.

/s/(ARR)

_____
Allyne R. Ross
United States District Judge

Dated:      February 14, 2012
           Brooklyn, New York